UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
M.V., an infant by his mother and natural guardian
LORENA CARPIO, and LORENA CARPIO,
individually,

                    Plaintiffs,

-against-

THE UNITED STATES OF AMERICA,

                    Defendant.
------------------------------------------------------------------X

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**15-CV-597 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

    Plaintiff M.V., a minor, brought this action against the United States through his mother and natural guardian Lorena Carpio ("Plaintiff" or "Carpio"),[1] pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq. (Verif. Compl. ¶ 1 (Dkt. 5).) Plaintiff alleges that during the course of her obstetrical and gynecological care and treatment at the Lutheran Family Health Center (the "LFHC"), a federally funded clinic, employees of the LFHC Maternal Fetal Medicine ("MFM") Unit committed medical malpractice.[2] (Id.) Plaintiff avers that this medical malpractice was the direct proximate cause of her premature labor and delivery of M.V. (Id. ¶ 16.)

---

[1] "A claim may properly be made on behalf of an infant for injuries allegedly sustained in utero or due to premature birth attributed to defendants' malpractice in their prenatal care of the infant plaintiff's mother." Nieves v. Montefiore Med. Ctr., 760 N.Y.S.2d 419, 421 (N.Y. App. Div. 2003) (citing Woods v. Lancet, 102 N.E.2d 691 (N.Y. 1951)). Carpio has withdrawn all claims pertaining to her, individually. (See Joint Pre-Trial Order (Dkt. 29) at 4 (Stip. 8).)

[2] The Federally Supported Health Centers Assistance Act, codified as 42 U.S.C. §§ 233(a)-(n), provides that claims for medical malpractice brought against federally funded clinics and employees of those clinics must be brought pursuant to the FTCA. Pursuant to that same statute, federally funded clinics and employees of those clinics are considered employees of the United States.

1

On November 29 and 30, 2016, the court held a bench trial, limited to the issue of liability.[3] After considering the evidence at trial, and having reviewed the parties' post-trial submissions, the court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the court finds that the United States is not liable to Plaintiff under the FTCA.

I. **FINDINGS OF FACT**

   **A. Background**

In August 2012, Carpio was pregnant with a child, M.V., fathered by her boyfriend, Christian Vela. (Bench Trial Tr. ("Tr.") (Dkts. 38, 39)[4] 123:21; Tr. 125:4-6.) Prior to her pregnancy with M.V., Carpio had two pregnancies that ended in preterm deliveries. (Tr. 146:7-15.) Both of her preterm deliveries were the result of a premature rupture of her membranes. (Tr. 249:14-19.) Because of her history of preterm deliveries, Carpio knew that her pregnancy with M.V. was a high-risk pregnancy. (Tr. 146:9-15.)

After learning she was pregnant with M.V., Carpio initially went to the Willoughby Clinic in Downtown Brooklyn for prenatal care. (Tr. 125:16-22.) The Willoughby Clinic told Carpio that she needed to go a hospital that specialized in high-risk pregnancies so Carpio went to the LFHC. (Tr. 127:21-128:6.) On August 18, 2012, Carpio had an appointment with a certified nurse midwife at the LFHC. (Tr. 146:16-25.) The midwife scheduled a series of follow-up appointments for Carpio, including an appointment on September 27, 2012, for a sonogram. (Tr. 128:21-24; Tr. 147:1-3.)

---

[3] On April 12, 2016, the parties jointly requested that the court bifurcate the trial of this matter into a liability phase and a damages phase, with the liability phase to be tried first. (See Consent Mot. to Bifurcate Trial (Dkt. 18).) The court granted the request on April 14, 2016. (Order (Dkt. 19).)

[4] The trial transcript is docketed as two separate documents. Transcript pages 1-188 can be found at Dkt. 38. Transcript pages 189-299 can be found at Dkt. 39.

2

On September 27, 2012, Carpio had a sonogram at the LFHC's MFM Unit. (Tr. 129:24-130:1; Pl. Ex. 1 at CARPIO LUTHERAN MEDICAL CENTER ("CLMC") 000010.) The sonogram showed that Carpio's cervix measured 1.8 centimeters, a shorter than average measurement. (Tr. 201:16-202:3; Tr. 239:8-22; Pl. Ex. 1 at CLMC 000042.) Carpio was told that she needed to return to the MFM Unit for a follow-up appointment on October 4, 2012. (Tr. 128:19-129:3; Tr. 130:10-24.) In fact, she was told it was an "emergency . . . for [her] to come [back]" to the clinic. (Tr. 128:19-129:5.)

On October 4, 2012, Carpio took a taxi from Vela's apartment in Brooklyn to the LFHC for her follow-up appointment. (Tr. 131:2-21; Tr. 154:6-12.) Carpio had a sonogram performed by Sonia Serrano, an ultrasound technician, in the MFM Unit. (Tr. 284:21-285:7; Tr. 280:23-24; see Pl. Ex. 1 at CLMC 000146.) The sonogram started at approximately 1:40 p.m. and was completed at approximately 1:55 p.m. (Tr. 294:17-20.) The sonogram showed that Plaintiff's cervix measured 1.4 centimeters (Pl. Ex. 1 at CLMC 000146), shorter than the 1.8 centimeter measurement at her appointment on September 27, 2012 (Tr. 207:5-8). The sonogram also showed funneling of the cervix and the presence of amniotic fluid or "sludge." (Pl. Ex. 1 at CLMC 000146.)

At the conclusion of the sonogram, Serrano told Plaintiff to get dressed and wait in the MFM Unit's reception area to speak with a doctor. (Tr. 132:25-133:11; Tr. 134:21:135:1.) After waiting at reception for some time, Plaintiff asked the receptionist if she could leave, explaining that she needed to pick up her daughter, Dynasty, from school at 2:30 p.m. that day. (Tr. 135:2-20.) The receptionist told Plaintiff that she needed to wait for the doctor. (Tr. 135:3-13; Tr. 148:6-8.) Shortly thereafter, Plaintiff told the receptionist that she had to leave. (Tr. 148:9-13.) The receptionist asked Plaintiff to leave a contact number.

3

(Tr. 148:9-13.) Plaintiff provided Vela's cell phone number and left the MFM Unit.

(Tr. 148:9-16; Gov't Ex. B at CARPIO SUNSET PARK ("CSP") 000004; see also Tr. 169:10-15.)

That same day, Dr. Iffath Hoskins, the attending physician assigned to the MFM Unit that day, reviewed the results of Carpio's October 4, 2012, sonogram and determined that Carpio needed to go to the LFHC's Labor and Delivery Unit ("Labor and Delivery") for further testing. (Tr. 217:2-218:22.) Labor and Delivery would test for an underlying infection (Tr. 217:22-218:8) and also conduct a fetal fibronectin test, which provides information as to whether a patient might deliver within the next 7 to 10 days (Tr. 220:24-221:19). Dr. Hoskins instructed Arlene Nassr, the supervisor of the MFM Unit, to contact Carpio by telephone and advise her to go to Labor and Delivery. (Tr. 31:11-21.)

### B. The LFHC's Follow-Up Communications With Carpio

For the reasons set forth infra in Section I.B.1., the following factual findings are based on Nassr's testimony concerning the LFHC's follow-up communications with Carpio.

Pursuant to Dr. Hoskins's instructions, Nassr placed several calls to Vela's cell phone—the contact number Carpio had left with the MFM Unit's reception—in an effort to contact Carpio. Nassr first called Vela's cell phone on October 4, 2012, at 3:35 p.m. (Tr. 33:1-7; Tr. 290:16-21.) There is no evidence that Nassr spoke to Vela at that particular time. Nassr placed a second call to Vela's cell phone at 4:02 p.m. that day and reached Vela, however. (Tr. 34:12-21; Tr. 291:3-6.) Nassr told Vela that she needed to speak with Carpio and that Carpio needed to come back to Labor and Delivery as soon as possible. (Tr. 34:24-35:8.) Nassr contemporaneously documented this call in the LFHC's medical records; her notes indicate that Vela told her that he would contact Carpio and advise her to go to Labor and Delivery for further

4

testing as soon as possible as per Dr. Hoskins's instructions. (Tr. 44:11-45:10; Gov't Ex. B. at CSP 000004.) At 6:12 p.m. on October 4, 2012, someone called the clinic from Vela's cell phone. (Tr. 291:7-9.) The call lasted only 21 seconds (id.) and Nassr does not recall speaking to Vela at this time (Tr. 37:20-4).

The following morning, on October 5, 2012, Nassr checked to see whether Carpio had gone to Labor and Delivery and learned that she had not yet returned to the clinic. (Tr. 38:5-13.) At 9:16 a.m. on October 5, 2012, Nassr placed another call to Vela's cell phone (Tr. 291:10-13; Tr. 39:5-17) as it was the custom and practice of the MFM Unit to follow up with a patient until someone from the office spoke directly with the patient (Tr. 38:14-39:4). Vela answered Nassr's call; Nassr reiterated to Vela that it was important that Carpio come to Labor and Delivery that day. (Tr. 39:5-17.) Vela said that he had given Carpio the previous message and that Carpio would be coming in that day. (Tr. 46:13-18; Gov't Ex. B. at CSP 000003.) At approximately 1:00 p.m. that same day, Nassr documented that she had spoken with Vela earlier that day and that Carpio still had not come to Labor and Delivery. (Gov't Ex. B at CSP 000003; Tr. 39:20-24.)

At 1:33 p.m., Carpio called the MFM Unit using Vela's cell phone. (Tr. 291:4-16; Tr. 41:2-4.) Carpio placed the call from, or very nearby, Vela's apartment. (Tr. 294:9-15.) Nassr told Carpio that she needed to come to Labor and Delivery and Carpio said she understood and agreed to go to Labor and Delivery that same day. (Tr. 41:2-9.) Nassr did not discuss Carpio's medical condition with her. (Tr. 41:21-25.) Nassr documented her conversation with Carpio shortly thereafter. (Tr. 41:10-17; see Gov't Ex. B at CSP 000002.) After their conversation, Nassr felt her task was complete and did not follow up with Carpio further. (Tr. 2:1-9.)

5

Despite the fact that Carpio agreed to go to Labor and Delivery on October 5, 2012, she never actually returned to the clinic for further testing. (Tr. 240:14-241:15.) The next time Carpio sought medical attention was on October 15, 2012, when she gave birth to M.V. prematurely at Kings County Hospital. (Tr. 145:6-20.) Notably, when Carpio presented at the hospital on October 15, 2012, she was having irregular contractions, was 2 centimeters dilated, and 50 percent effaced. (Tr. 250:3-9.)

1. Credibility Of The Witnesses

The parties dispute certain key facts concerning the LFHC's communications with Carpio and Vela after Carpio's October 4, 2012, sonogram. As documented above, Nassr recalls speaking with both Vela and Carpio about the need for Carpio to return to the clinic for further testing. Yet Carpio and Vela deny that they ever spoke with anyone from the LFHC after Carpio's sonogram. The court finds that Nassr's testimony is credible and corroborated by Nassr's contemporaneous notes of her telephone conversations (see Gov't Ex. B) and the AT&T phone records for Vela's cell phone (see Gov't Ex. C; Tr. 292:23-294:20 (stipulation concerning phone records).

By contrast, Vela and Carpio's testimony regarding their communications with the LFHC defies common sense, is contradicted by the documentary evidence introduced at trial, and is often internally inconsistent. Vela's testimony that he does not remember getting any phone calls from the LFHC about Carpio (Tr. 177:13-25; Tr. 185:12-186:4) is flatly belied by Carpio's medical records and his own cell phone records. In addition, Vela's testimony about whether Carpio uses his cell phone is internally inconsistent. Vela testified during his deposition that Carpio "never" used his cell phone. (Tr. 181:16-11; 182:19-10.) During his direct examination at trial, however, he testified that Carpio "of course" used his cell phone. (Tr. 176:24-177:6;

6

Tr. 181:13-15.) On cross-examination, Vela changed his testimony again, stating that Carpio "never uses [his] phone on a weekday." (Tr. 186:11-14.)

Carpio's testimony is similarly inconsistent and uncorroborated. Despite the above referenced evidence that Carpio spoke with Nassr on October 5, 2012, Carpio testified that after her October 4, 2012, sonogram, she did not communicate with the LFHC until she gave birth to M.V. on October 15, 2012.[5] (Tr. 140:19-22; Tr. 144:9-24; Tr. 145:6-16.) Carpio also testified that Vela "never" told her that someone from the MFM Unit had called him and that the clinic wanted her to return to Labor and Delivery. (Tr. 140:23-141:1; Tr. 144:20-24.) To assess the veracity of this testimony, the court sought to ascertain where Carpio was living in October 2012, explaining to Carpio that her living situation was relevant to whether she was with Vela when he received the calls from the MFM Unit and also to whether Vela gave Carpio the messages from the MFM Unit. (Tr. 139:9-140:14.) Carpio's testimony on this topic was scattered, evasive, and unbelievable. She testified on direct examination that she was "back and forth" between her mother's home and Vela's apartment and would have been living with either Vela or her mother on October 4 and 5, 2012. (Tr. 136:12-137:20.) When asked by the court how she would get her daughter Dynasty to school in Brooklyn from her mother's house in Queens, Carpio testified that her father would drive her to Vela's house, which was within walking distance of Dynasty's school, "in the middle of the night." (Tr. 136:24-137:12; Tr. 142:24-143:15.) This story of middle-of-the-night shuffling is far-fetched, especially given Carpio had a 10-year-old daughter during the time in question. (See Tr. 135:14-16.) It also contradicts Carpio's deposition testimony that she was living with Vela in October 2012. (Tr. 149:25-151:1.) Overall, the credible evidence in this case points to the fact that Carpio was

---

[5] Carpio testified at trial that she called the LFHC after giving birth to M.V. on October 15, 2012 (Tr. 145:6-16); however, she testified at her deposition that she did not recall calling the LFHC after M.V.'s birth (Tr. 158:2-7).

7

living with Vela in October 2012. In view of the fact that Vela received several calls from the LFHC, Vela and Carpio were living together, and Carpio's own testimony that Vela would come home from work during the day,[6] Carpio statement that Vela "never" told her that someone from the MFM Unit had called and that the clinic wanted her to return to Labor and Delivery is not credible.

### C. Carpio Most Likely Did Not Have An Incompetent Cervix

The parties also dispute what caused Carpio to deliver M.V. prematurely. Plaintiff's expert, Dr. Richard Luciani,[7] testified that M.V. was born prematurely because Carpio had an incompetent cervix. (Tr. 67:13-68:4.) By contrast, Dr. Hoskins and Defendant's expert, Dr. Joseph Finkelstein,[8] testified that while Carpio's cervix was shortening, she did not have an incompetent cervix. (See Tr. 223:16-23 (Dr. Hoskins testifying that "there was no information saying that the cervix was opening, it was only shortening"); Tr. 251:14-15 (Dr. Finkelstein testifying that Carpio "by history and by presentation . . . did not have an incompetent cervix"); cf. Tr. 249:20-23 (Dr. Finkelstein testifying that "there is a distinct difference between a shortened cervix . . . [and] an incompetent cervix").) The court finds that Carpio mostly likely did not have an incompetent cervix.

An "incompetent cervix" is defined as "painless dilation and delivery in [the] second trimester" of pregnancy. (Tr. 264:24-265:22 (Dr. Finkelstein testifying to and adopting the American College of Obstetrics and Gynecology's ("ACOG") definition of an incompetent

---

[6] Carpio testified that Vela comes home "several times" during the day. (Tr. 150:3-16.) In fact, Carpio testified that on October 4, 2012—the day of her second ultrasound—Vela picked her up from Dynasty's school in the afternoon, "took [Carpio] home," and ate before returning to work. (Tr. 135:24-4.)

[7] Dr. Luciani is a physician who operates a private practice specializing in obstetrics and gynecology. (Tr. 54:22-55:10.)

[8] Dr. Finkelstein is a board-certified physician in obstetrics and gynecology (Tr. 234:23-235:1) and member of ACOG (Tr. 235:11-15).

8

cervix); see Tr. 74:22-25 (Dr. Luciani agreeing to this definition).) Carpio did not have a history of premature delivery as a result of an incompetent cervix; rather, both of her preterm deliveries were the result of a premature rupture of her membranes. (Tr. 249:14-19 (Dr. Finkelstein testimony).) Moreover, when Carpio presented at the hospital on October 15, 2012, she was having irregular contractions, was 2 centimeters dilated, and 50 percent effaced: "If a patient had an incompetent cervix . . . at a minimum she would have presented at 6, 8, 9 centimeters dilated." (Tr. 250:3-9 (Dr. Finkelstein testimony).) In addition, Carpio was experiencing contractions when she came to the hospital on October 15, 2012 (Tr. 105:22-106:5 (Dr. Luciani testimony)), which is inconsistent with having an incompetent cervix (see Tr. 223:3-15 (Dr. Hoskins testifying that generally a patient will not experience contractions if she has an incompetent cervix)).

### D. The Proper Course of Treatment Following Carpio's October 4, 2012, Sonogram

Had Carpio followed Nassr's instructions and returned to the clinic, Labor and Delivery likely would have taken the following steps in treating Carpio: (1) checked to see whether Carpio exhibited any signs of an intrauterine or cervical infection; (2) conducted a fetal fibronectin test ("FFN"), which determines whether there is an increased risk that a patient will go into premature labor in the next 7 to 10 days; and (3) placed Carpio on a "fetal monitor to determine whether or not [she] was having contraction[s] and whether or not the changes that were occurring in the cervix were due to preterm labor." (Tr. 247:19-248:16 (Dr. Finkelstein testimony).)

It is unlikely that Labor and Delivery would have placed a cerclage in Carpio's cervix because a cerclage "does not fix anything other than an incompetent cervix" and, as stated above, Carpio most likely did not have an incompetent cervix. (Tr. 252:16-17 (Dr. Finkelstein

9

testimony). Accordingly, if a cerclage had been placed, Carpio "still would have gone into preterm labor on October 15, at which point you would have had a situation where you had a cerclage with someone in labor which would have required either an immediate C-section or removal of the cerclage; otherwise it's going to rip." (Tr. 249:4-251:21 (Dr. Finkelstein testimony).)

### E. Carpio Has A History Of Non-Compliance With Medical Appointments

The evidence presented at trial demonstrates that Carpio has a history of missing medical appointments. She admits that she (1) missed a "fair number of appointments" at the LFHC, including several neurology appointments (Tr. 156:22-157:12); (2) failed to follow-up with her physician about a previous thyroid condition (Tr. 157:5-12); and (3) while pregnant with M.V., missed her first prenatal appointment, which was scheduled with a high-risk OB/GYN doctor (Tr. 156:12-21). In addition, Carpio was non-compliant with M.V.'s doctor's appointments after M.V. was born. (Tr. 93:19-95:13 (Dr. Luciani testimony).)

## II. CONCLUSIONS OF LAW

### A. Legal Standard

Under the FTCA, a plaintiff may recover for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Liability is determined based on the "law of the place where the act or omission occurred." Id.; see also Molzof v. United States, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is

generally determined by reference to state law.") Because the alleged malpractice occurred in New York, New York law applies.

"[T]o establish a claim of medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." Milano by Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 2005). Plaintiff must prove each element by a preponderance of the evidence. See Metzen v. United States, 19 F.3d 795, 807 (2d Cir. 1994). Furthermore, New York law provides that "'except as to matters within the ordinary experience and knowledge of laymen, . . . expert medical opinion is required' to make out both of these elements." Milano, 64 F.3d at 95 (citing Fiore v. Galang, 478 N.E.2d 999, 1001 (1985)).

With respect to the standard of care, a physician must exercise "that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices." Nestorowich v. Ricotta, 767 N.E.2d 125, 128 (N.Y. 2002) (internal quotation marks and citation omitted). "A doctor is charged with the duty to exercise due care, as measured against the conduct of his or her own peers—the reasonably prudent doctor standard." Id.

With respect to the proximate cause element, a plaintiff must establish that the defendant's breach was a "substantial contributing factor" in causing plaintiff's injury. McDermott v. City of Watertown, 936 F.2d 677, 679 (2d Cir. 1991) (citing Kush v. City of Buffalo, 449 N.E.2d 725, 729 (N.Y. 1983)). Where there are "several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery." Bernstein v. City of N.Y., 511 N.E.2d 52, 53 (N.Y. 1987) (citations omitted). A

plaintiff "need not prove, however, that the defendant's conduct was the sole cause" of the injuries incurred. McDermott, 936 F.2d at 679.

### B. Application

#### 1. Expert Testimony On The Standard Of Care

The parties agree that the LFHC staff provided appropriate medical care to Carpio up until and including Carpio's sonogram on October 4, 2012. (See Tr. 74:1-19.) They also agree that because Carpio needed follow-up care after she left the LFHC on October 4, 2012, the LFHC had a responsibility to follow up with her. (See Tr. 76:7-10; Tr. 77:24-78:4; Tr. 241:16-242:1.) The parties have different views as to (1) what the standard of care requires in terms of the method and content of follow-up communications; and (2) whether the LFHC's communications with Carpio after October 4, 2012, met that standard. In this section, the court summarizes the expert witnesses' testimony on these issues.

Dr. Luciani testified that when a patient has a clinical condition that presents an "emergency," the standard of care requires that the healthcare provider immediately convey the seriousness of the medical problem to the patient and ensure that the patient understands the seriousness of the situation and the consequences of lack of action. (Tr. 59:21-60:13; Tr. 60:14-61:12.) If a patient does not respond to the medical provider's communications appropriately, the standard of care requires that the medical provider send a registered letter to the patient, explaining the medical problem. (Tr. 60:14-61:12.)

Dr. Luciani concluded that the standard of care was not met by the LFHC staff because, in his opinion, Carpio "was never informed of the seriousness of the problem that she had or the consequences of not addressing that problem." (Tr. 65:2-66:5) He testified that there is not a single notation in the record that indicates that Carpio understood the nature of the problem.

(Tr. 61:13-25.) In his opinion, Nassr's conversation with Carpio on October 5, 2012, did not meet the standard of care because Nassr did not indicate why Carpio had to come back to the clinic: "There was no urgency of this phone call that, look, this is an emergency, you need to get here, your baby's life is in jeopardy." (Tr. 66:6-19.) He testified that although Nassr had no formal medical training, she could nonetheless have conveyed the seriousness of the problem to Carpio. (Tr. 66:20-67:3.) Dr. Luciani explained that the staff at his private practice routinely advise patients if there is something serious concerning their medical condition. (Tr. 67:4-12.)

Conversely, Dr. Finkelstein testified that when a patient who requires follow-up medical care leaves a healthcare provider's premises without having spoken to someone about the need for follow-up care, a clinic meets the standard of care when it (1) communicates with the patient directly, informing her of the need for further care; and (2) obtains the patient's agreement or understanding that follow-up care is necessary (Tr. 241:16-242:23). It need not be a doctor that contacts the patient. (Tr. 242:7-8.)

Dr. Finkelstein concluded that Nassr met the standard of care when she spoke to Carpio on October 5, 2012, and advised Carpio that she needed to come back to the clinic for further testing. (Tr. 242:9-23; Tr. 245:2-11.) It was not a departure from the generally accepted standard of care, Dr. Finkelstein testified, that Nassr did not provide Carpio with the results of her sonogram on their October 5, 2012, call. (Tr. 243:8-244:7.) Nothing in the ACOG guidelines dictates that not providing sonogram results during a telephone call would be a departure from the generally accepted standard of care. (Tr. 244:19-245:1.) He further explained:

> If the patient had stated to Arlene Nassr 'I'm not coming back,' then it would have been the responsibility to have a medical provider explain to the patient the need. But since the patient understood – and she already knew from the prior sonogram on

13

> 9/27 that she had a problem situation that she needed to return on
> the 4th. This was not a surprise. This was not in a vacuum.

(Tr. 243:15-21.)

Finally, Dr. Finkelstein testified that sending a certified letter with medical information to a patient with whom you have been able to make direct contact is not considered the standard of care. (Tr. 246:5-247:7.) Nothing in the ACOG, state, or federal guidelines or any hospital policy that he had seen indicates that healthcare providers should send detailed medical information in a registered letter to a patient. (Tr. 246:5-247:1.) Moreover, he stated, it is always preferable to speak to the patient directly, rather than send the patient a letter, because with a conversation, the healthcare provider will hear the patient's response and know that the patient understands the need to follow the clinic's instructions. (Tr. 247:2-7.)

### 2. The LFHC Met The Standard Of Care

The court adopts Dr. Finkelstein's definition of the generally accepted standard of care, as it is based on objective guidelines, including those promulgated by ACOG. By contrast, Dr. Luciani's opinions were based solely on his own experience practicing in obstetrics and gynecology. (Tr. 84:13-89:7.) Dr. Luciani was unable to point to ACOG guidelines, or any other set of guidelines, that supported his opinion. (Id.) Accordingly, the court concludes that the standard of care requires a medical provider to: (1) communicate with the patient directly; (2) inform the patient of the need for further care; and (3) obtain the patient's agreement or understanding that follow-up care is necessary. (See Tr. 241:16-242:23 (Dr. Finkelstein testimony).)

Plaintiff has failed to establish by a preponderance of the evidence that the LFHC staff breached the standard of care. Rather, the court finds that the standard of care was met when

14

Nassr spoke with Carpio directly on October 5, 2012. Nassr told Carpio that she needed to go to Labor and Delivery that same day for further testing, and Carpio agreed to do so.

Plaintiff has failed to put forth any evidence to support the possibility advanced by Plaintiff's counsel that Carpio spoke with Nassr on October 5, 2012, but Carpio failed to understand the urgency of the message. (See Pl. Proposed Findings of Fact (Dkt. 38) ¶¶ 91, 111, 123.) Carpio testified that she did not think there was any urgency to follow-up care after the October 4, 2012, sonogram but, in view of the evidence, this is implausible. (See Tr. 155:17-21.) Carpio knew that she had a high-risk pregnancy. (Tr. 146:12-15.) She also admits that she was told it was an "emergency" for her to come back to the clinic after her September 27, 2012, sonogram. (Tr. 129:24-130:12.) After her next sonogram on October 4, 2012, she was told on three separate occasions that she needed to wait at the clinic to speak with the doctor. (Tr. 133:3-11; Tr. 134:21-135:13; Tr. 148:3-13; Tr. 155:11-13.) Nassr called Vela's cell phone three times in a 16-hour period to instruct Carpio to return to the clinic. (Tr. 290:16-291:13; Tr. 292:23-294:8; Tr. 295:2-4.) When Nassr spoke with Carpio on October 5, 2012, Nassr told Carpio that she needed to return to the clinic <u>that same day</u>. (Tr. 41:2-9; Gov't Ex. B at CSP 000002.) Based on these facts, Carpio's testimony that she "never [thought] . . . anything [was] wrong" after her October 4, 2012, sonogram is unconvincing. (Tr. 155:17-21.)

Furthermore, the court is unpersuaded by Plaintiff's expert Dr. Luciani's testimony that Nassr should have informed Carpio of her abnormal sonogram findings on their call or told Carpio that her baby's life was in danger. (See Tr. 66:6-19.) As an initial matter, it is speculative to assume that "a differently-worded telephone conversation," as Defendant puts it, "would have changed Carpio's decision to return." (See Def. Proposed Findings of Fact ("Def. Prop. Findings") (Dkt. 37) at 36.) This is especially true in light of her history of non-

compliance with medical appointments. (See supra Section I.E.) Moreover, the court accepts Dr. Finkelstein testimony that it would have been "highly inappropriate" for Nassr to discuss the sonogram results with Carpio "because Nassr is not a medical[ly] trained person." (Tr. 224:7-11.) Moreover, Dr. Finkelstein convincingly explained that he would not have provided Carpio with a diagnosis prior to testing at Labor and Delivery. (Tr. 220:17-23.)

Finally, the court finds that Dr. Luciani's testimony that the LFHC should have sent a certified letter with the sonogram findings to Carpio is inconsistent with the standard of care. The court credits Dr. Finkelstein's testimony that nothing in the ACOG, state, or federal guidelines or any hospital policy that he has ever seen indicates that healthcare providers should send detailed medical information in a registered letter to a patient. (Tr. 246:5-247:1.) Moreover, as Defendant points out, a certified letter "likely would not have even . . . reached Ms. Carpio, who was not living at the address of record that she had provided to the LFHC." (Def. Prop. Findings at 35.) Besides it is highly unlikely that a letter from the LFHC would have persuaded Carpio to return to the clinic for further testing when a telephone call from Nassr, informing that she needed to return to the client that day, did not motivate her to return. (See id.)

### 3. Plaintiff Failed To Prove Proximate Causation

Even if the LFHC had breached the standard of care, which it did not, Plaintiff has failed to prove that the LFHC's alleged breach was a "substantial contributing factor" in causing M.V.'s premature birth. See McDermott, 936 F.2d at 679. In light of Carpio's history of non-compliance with medical appointments, it is far from certain that Carpio would have returned to the LFHC for further testing had she received additional medical information from Nassr on their October 5, 2012, call.

Furthermore, even if Carpio had returned to the clinic as instructed, there is no evidence that M.V.'s premature birth could have been prevented by placing a cerclage in Carpio's cervix, as Plaintiff suggests. (See Tr. 67:13-68:11; Tr. 69:3-13.) As stated above, the court finds that Carpio mostly likely did not have an incompetent cervix. (See supra Section I.C.) The court credits Dr. Finkelstein testimony that a cerclage "does not fix anything other than an incompetent cervix." (Tr. 252:16-17.) Accordingly, even if a cerclage had been placed, Carpio likely "still would have gone into preterm labor on October 15." (Tr. 249:4-251:21 (Dr. Finkelstein testimony).)

Even accepting as true Dr. Luciani's conclusion that Carpio had an incompetent cervix, both experts agree that the next step in Carpio's medical treatment was further testing. (See Tr. 64:3-20; 247:19-248:16.) Dr. Luciani concedes that placement of a cerclage would only have been appropriate if further testing had revealed that Carpio did not have an infection in her cervix. (Tr. 64:3-20.) Because it is impossible to know what such testing would have revealed, there is no way to predict whether a cerclage would have been placed in Carpio's cervix and, consequently, whether Carpio's premature labor could have been prevented by placement of a cerclage.

In sum, Plaintiff has failed to meet her burden of proving that the LFHC breached the standard of care or that any breach proximately caused M.V.'s premature birth.

### III. CONCLUSION

For the foregoing reasons, the court finds that the United States is not liable to Plaintiff under the FTCA. Accordingly, the damages portion of this proceeding is moot. The Clerk of

Court is respectfully DIRECTED to enter judgment in favor of the United States and close the case.

SO ORDERED.

Dated: Brooklyn, New York
April 17, 2017

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge